## Robert N. Keely, Jr., and G. G. Davis v. Rufus C. Hartranft, Appellant.

*Contract—Construction of—Parol evidence.*

Plaintiffs, the authors of a book, and the owners of the plates and copyright thereof, delivered the plates to defendant, and by a written contract agreed that he should be the publisher of the book, and have all the rights and use of the same, and that defendant should be the publisher of the book. Plaintiffs were to receive one quarter of the net profits arising from the sale of the book by defendant. The written contract did not prescribe the form, style or quality of the work, or fix the selling prices. All the expenditures connected with the publication and sale of the book were to be borne by the defendant. Three editions of the book were published.

There was evidence that at the time the written contract was executed there was a parol agreement providing that the book should be printed on a certain fine quality of paper, and that it should not be sold under a certain specified price per copy, which the master and the court found should be construed to apply only to the first edition and not to extend to the second and third editions; *Held*, (1) that as to the copies of the second and third editions, the form, style and quality of the work and the selling price of it were left to the discretion of the defendant; (2) that the defendant was not required to continue the publication and sale of the book at a loss, but it was his duty to do all that he reasonably could to promote the success of the enterprise; (3) that in an accounting after the sale of the book had practically ceased, the amount expended in the publication of the unsold books should be deducted from their market value, and one fourth of the balance, if any, should be paid to the plaintiffs.

Argued March 24, 1896.    Appeal, No. 213, July T., 1895, by defendant, from decree of C. P. No. 4, Phila. Co., Dec. T,, 1893, No. 274, on bill in equity.    Before STERRETT, C. J., GREEN, McCOLLUM, MITCHELL and DEAN, JJ.    Reversed.

Bill in equity for an account.

The case was referred to John F. Keator, Esq., as master. ·

From the record it appeared that on January 19, 1894, plaintiffs and defendant entered into a contract in writing which was as follows:

"We, Robert N. Keely, Jr., and G. G. Davis, of Philadelphia, hereby deliver to R. C. Hartranft the plates and convey all rights and use of same of the book, 'In Arctic Seas,' and also 500 copies of the book in sheets, and appoint him publisher, and agree that no right to use or print any part or portion of the work or material therein contained will be transferred or sold or loaned by us to any other person or persons without the written consent of R. C. Hartranft aforesaid.    We also agree to supply R. C. Hartranft with matter (copy) for 200 additional pages to be added to the work in mention and to make this delivery not later than the 10th day of October, 1892.

"We hereby renounce all right of publication in favor of R. C. Hartranft and agree not to sell or deliver any copies of 'In Arctic Seas,' to any person without his written consent.    We also agree to hand over to R. C. Hartranft any and all future orders which may be sent us through trade or other channels or from Messrs. Stern & Co.

VOL. CLXXVIII—25

" We contribute the above named 500 copies to the advertising fund, to push said book, R. C. Hartranft agreeing that said sheets are of the value of forty cents per copy, which sum he agrees to pay to Messrs. Keely & Davis out of the net profits derived from the sale of the first 2000 copies of said book, bearing his imprint. We agree to accept as payment for this specified transfer of right and 500 copies in sheets, the sum of twenty-five (25) per cent. of the net profits arising from the handling of the work realized from the enterprise by R. C. Hartranft.

" We, Messrs. Keely & Davis, base this contract upon the fact that there are no debts or liens of any character upon the plates or copyright of the book specified ' In Arctic Seas,' and agree not to place any liens or pledge upon either plates or copyright, while in the possession of R. C. Hartranft. We further agree that any violation of this contract shall entitle R. C. Hartranft to withhold any royalty percentage arising from profits of the enterprise.

" R. C. Hartranft agrees to pay for the within named transfer the one-quarter of any and all net profits that accrue to him from the handling of the book, ' In Arctic Seas.' We also agree that he is to be the contractor for the debts of the venture, and that Messrs. Keely and Davis will not be called upon to individually assume any loss of the venture of publication.

" R. C. Hartranft agrees to pay a bonus of $500 to Messrs. Keely & Davis after the number of 5000 copies of the book have been sold and paid for in addition to the one-quarter of the net profits as specified."

The master found in part as follows :

Upon the return of Robert N. Keely, Jr., M. D., one of the plaintiffs, from his trip toward the North Pole with Lieutenant Peary, he wrote a book in conjunction with G. G. Davis, M. D., the other plaintiff. This book, which they entitled " In Arctic Seas " described the voyage of the ship " Kite " to the winter quarters chosen by Peary, the farewell between those who remained in Greenland with that intrepid explorer and those who came back with the Kite, and the return of the latter, among whom was Dr. Keely, to Philadelphia in September, 1891. It was printed for the plaintiffs by Edward Stern & Co., of

Philadelphia, on the best paper obtainable by the plaintiffs, the book being an octavo volume of two hundred and fifteen pages. Of this edition, the plaintiffs disposed of four hundred copies and had remaining six hundred copies of the work in printed, unbound sheets.   This was the status of affairs when news reached Philadelphia that Lieutenant Peary, who had been left in Greenland, had survived the winter of 1891–1892.  After that event there was no sale of plaintiffs' book as it did not narrate occurrences to date.   On the 4th of July, 1892, the Academy of Natural Sciences of Philadelphia sent out a relief expedition that was to find Peary and learn if he had made the intended dash overland toward the North Pole and to bring him home. This relief expedition brought Peary back to Philadelphia in September, 1892, and it was this return of the explorer, with the tale of his sojourn in the North and the results of his expedition, that the plaintiffs were compelled to incorporate in their book, if they wished to make its sale profitable.   This necessity of bringing out an edition to date being recognized by the plaintiffs, they looked around them for a publisher, and finally made on September 29, 1892, the contract with Rufus C. Hartranft, the defendant, which is set out in plaintiffs' bill, and which provided among other things that the six hundred copies of plaintiffs' book should be used in the compilation of the new book. This contract is silent as to the nature of the book that was to be published, but Dr. Keely says : " The arrangement with Mr. Hartranft was to be of as high a character as possible."   Dr. Davis testified, "we discussed the manner of publication, the defendant, myself and Dr. Keely, and it was mutually decided to issue the book in the same good style as had characterized the book published by Stern."   The reason plaintiffs had gone to Stern for the printing of their book was that " Stern was one of the best printers in the city, and they wanted to have as finely finished a book as possible," and the reason that Stern did not print their second book was, as Dr. Keeley testified, because Mr. Hartranft told them the book had not been properly managed, and he made favorable inducements to plaintiffs.   Dr. Davis testified that the defendant represented to plaintiffs that he could handle the book to a much better advantage, and that profits were to be made by publishing it and handling it in a different manner than theretofore.   " It was proposed to enlarge the book, and

to charge an increased price, and to handle it in, so to speak, a professional manner, in professional and legitimate avenues of trade, such as a book publisher is supposed to have at his convenience." Although the new book was to go from the printer, Stern, to a publisher, still Stern's quality of paper and style of book were to be adhered to. The cost of this quality of paper and style of book entered into the calculations of plaintiffs and defendant, as an element of the total cost of the work, and hence must have been agreed on. The defendant avers that as to two editions of the book he used such grade of paper and issued such style of book, and does not deny that such was the agreement, although he did once deny it; indeed, as to the six hundred copies of unbound printed sheets delivered to defendant, he would have been compelled to use similar paper and style of book for the incomplete parts in order to make up a uniform whole. The master therefore finds that the paper and style of the books that defendant published were to have been of the same quality as that of the book of the plaintiffs published by Stern, and that the defendant failed to keep this contract in this respect, so far as the third edition of the book was concerned.

An important point in the publication of the book was the cost per volume at which it should be sold, for, as averred by plaintiffs in their bill, and not denied by defendant in his answer, and as was the actual fact, inasmuch as the plaintiffs, as parties to the said contract, were to receive thereunder a specified share of the net profits of the publication and sale of the said book, the fixing and maintaining of the minimum price at which the same should be sold retail and to the trade was and is an essential feature, and part of the said contract.

The plaintiff, Dr. Keely, testified, " Mr. Hartranft assured us that a book of the quality that they proposed publishing should have its price fixed at $3.50, and that an edition of fifteen hundred would pay all expenses, and profit would then begin to accrue." His coplaintiff, Dr. Davis, testified, " The price of the book was fixed at $3.00 or $3.50. The book was to be sold at such a price that the average income was to be $2.00 per volume." Defendant Hartranft advertised in pamphlets and newspapers and by correspondence that the book was to sell at $3.50, and testified that " the price of publication agreed upon by both

parties was to be $3.00 to $3.50 a copy," adding that this applied only to the first edition of the work. He elsewhere said that their "agreement applied to only one edition; it was not known that more than one edition would be sold;" and he said again "The arrangement for all subsequent editions was left an open matter. I never arranged for any edition but the one the contract shows." It is to be noted that the contract does not call for any edition at all, and is silent as to any way of publishing the book except as to volume by volume. Dr. Keely testified that the wholesale price of not less than $2.00 per volume and retail price of not less than $3.00 to $3.50 per volume applied to all books that Mr. Hartranft should publish, and that nothing was said about editions. Dr. Davis said that there were no provisions made for any other edition, and no arrangements were made about one.

The master finds that the stipulations between plaintiffs and defendant with regard to the form and quality of the book to the effect that it should be of the same grade with the original book of the plaintiffs, and with regard to the price of the book, that it should be such as to yield an average profit of not less than $2.00 per volume wholesale, and not less than $3.00 per volume retail; that this was agreed to prior to or at the time of the written contract between plaintiffs and defendant, and induced the signing of the same; that these stipulations neither alter, modify nor contradict it, but simply regulate matters as to which it is silent, and that the defendant, in publishing a book of inferior quality to that published by Stern & Co., and in selling a book for less than $2.00 wholesale, and $3.00 to $3.50 retail, was guilty of a breach of his contract. In his testimony the defendant showed a curious ignorance concerning the price at which the book had been sold. He was unable to state positively that none had been sold by him at less than 75 cents per volume, and stated positively that some of the first edition, as to which he admits being bound to sell wholesale at not less than $2.00 per volume, were sold by him at $1.93 per volume. One of the plaintiffs bought the book at the North American office, where it is on sale at $1.24, and by an exhibit offered in evidence showed that it could be had at wholesale at 90 cents per volume, although they did not trace the sale at that rate to defendant, except by inference. The defendant's

own testimony convicts him of a disregard of the rights of the plaintiffs, both in disposing of the book at cheap prices and in publishing inferior books without notice to plaintiffs or consultation with them.

The next points in dispute that come naturally to be discussed are the number of books sold, the prices obtained, and the ascertainment of expenses of the publication and the consequent loss or profit. Although the defendant stated that he was a publisher, and that " In Arctic Seas " was the twentieth book he had published, and although he knew that he was bound to account to the plaintiffs at some time for their share in the book's profits, he did not keep a set of books. The bills for expenditures upon the book were his only evidence of such expenditures, and they were not kept in a ledger. In order to ascertain the cost of any portion of the work done, as, for instance, the binding or the printing of any one of the several editions, the defendant, upon inquiry of plaintiffs in regard thereto, simply stated that he had all bills, and offered them for the inspection of the plaintiffs, and further stated that he was unable to intelligently separate the various items of the bills produced, so as to give the exact cost of any one portion of the work done, as instanced above. Some of these bills were not receipted, others had been paid by the promissory notes of the defendant, some of which had been repeatedly renewed. In addition to this collection of bills, the defendant produced a scrapbook into which had been pasted from time to time the orders defendant had received for the books he was publishing for plaintiffs. This book professed to show the number of " In Arctic Seas " the defendant had received from the printer, the number he had parted with, and the number still in his possession. In connection with the scrapbook referred to, the defendant produced two other books which were supposed to throw light on and exemplify the scrapbook itself. One of these books marked " A," and called a trade sales book, contained the entries of sales made to book dealers, and of sales by the defendant directly to individuals ; the other marked " B, Agents," contained the entries of sales made for defendant by agents. The contents of these two books in this respect, it was said, were in the scrapbook. But the master finds that they do not completely tally with the scrapbook, and they are extremely unsatisfactory in their evidences of careful

and veracious bookkeeping. They undoubtedly show that in many instances their respective entries were not made contemporaneously with the entries in the scrapbook, and that both of them, in part at least, were compiled long after the date of the entries they contain, and that both of them are exceedingly unreliable. They frequently show on the face of their pages an entry of a sale, prior in time, following in space on the page a sale of much later date. There is no systematic entry in the books of defendant to show to which edition any particular sale belonged, except one judge by the date of the sale, but as it nowhere appears just when the respective editions were exhausted, the date at which a copy was sold was hardly a criterion as to which edition it belonged, nor was its price, for defendant did not adhere to any conformity in that regard. These were the resources offered the plaintiffs and master and, according to the defendant, the only ones at command upon which to find an account stated in this case. . . . The master finds that the defendant disposed of at least four thousand one hundred and forty-three copies of the book in dispute, and holds him liable therefor except as hereinafter stated.

Of this number the master finds that defendant has five bound in " levant " on hand, for which he must subsequently account to plaintiffs, has disposed of fifty-nine copies to libraries, has disposed of two thousand eight hundred and ninety copies by trade sales, has sold by agents eight hundred and eighty-eight copies ; one hundred and fifty-seven for cash and by mail; has given away to newspapers one hundred and forty-one copies, thus making a total of four thousand one hundred and forty copies, leaving three copies unaccounted for. This finding, except as to the five copies on hand, is a result of the master's search through all the books. As to the sums for which defendant should be charged on account thereof, in view of what the master finds to have been agreed upon as the selling price, the master finds that as to the two thousand eight hundred and ninety copies disposed of by trade sales, the defendant should have accounted to the plaintiffs at the rate of not less than $2.00 per volume, or a total of $5,780 ; that as to the eight hundred and eighty-eight copies sold by agents, the defendant should have accounted to the plaintiffs at the rate of not less than $2.00 each or $1,776.

That as to the one hundred and fifty-seven copies sold for cash and through the mail defendant should have accounted to the plaintiffs at the rate of not less than $3.00 per volume or a total of $671. The defendant seems never to have been given any authority to sell the book to libraries at a reduced price, or to give away copies of the book to individuals or to newspapers, and, on argument of this case, the master was asked by the plaintiffs to charge the defendant at $3.00 per volume for the books sold libraries, but as these reduced sales and gifts in all probability advertised the book to the benefit of the plaintiffs, the master charges the defendant with only his own statement of receipts from that quarter, viz : $124.38.

The defendant must account to the plaintiffs for the three volumes as to which there is no accredited sale entered in his book, they being of the money value of at least $6.00, or if specifically delivered by him as hereinafter decreed, they should be of the quality of the first edition of the book.

The four thousand one hundred and forty-three copies do not include the entire number printed ; as will be seen by the statement of the defendant, there are other copies, some of which are in unbound sheets, still in possession of the Historical Publishing Company.

It is to be noted that among the sales made by the defendant, stated in the above account, were four copies bound in levant, which books the defendant stated were to be sold at $10.00 per copy, and he did not recall any sales for less than that sum. His books however contained one entry of a sale of a copy bound in levant for $4.00. It is a trade sale and is included in the master's count at $2.00. The defendant should therefore have an additional charge against him of $2.00.

The three sales made at $10.00 each were each cash or mail order sales, and are included in the above count at $3.00 per volume. The defendant therefore should have an additional charge against him of $7.00 on each volume, or $21.00.

In addition to these charges the defendant sold to agents and others a large number of circulars, illustrating and advertising the book, and many prospectuses. The plaintiffs were charged by the defendant with the cost of printing these, but not given any corresponding credit for the sale thereof. The master finds that defendant obtained therefor the sum of $47.15, with which

defendant is accordingly charged. . . . This makes the total amount as to which the defendant should have accounted for the sum of $8,421.33, not including the three books unaccounted for, valued at not less than $6.00.

It may be apt to remark here that plaintiffs have abandoned their claim to a bonus of $500, it having been admitted that five thousand copies of the book, on the sale of which the bonus was founded, have not been sold. . . .

The account shows a balance in excess of expenditures as follows:

Total receipts from books, as stated by the master, . . . . . . . . $8,421 53
Expenditures, . . . . . . 5,998 77
      Balance . . . . . . $2,422 76

From this balance is to be deducted the sum of $240 which the plaintiffs were to be paid for their six hundred copies of their first book and which the defendant admitted to Melville Philips to be due the plaintiffs and which he admitted to Dr. Keely to be due with an additional sum. Moreover, the contract calls for it and the master finds it due plaintiffs from defendant.

This leaves a sum of $2,182.76 as the net profit of the transaction, one fourth of which under the contract is due from defendant to plaintiffs, and the master accordingly awards one fourth of $2,182.76 or $545.66 to plaintiffs from defendant in addition to the said sum of $240, or a total of $790.76. . . .

The master finds the copyright of the book published by the defendant belongs solely and exclusively to the plaintiffs.

Exceptions to the master's report were overruled and the following decree entered:

1. That the defendant, Rufus C. Hartranft, pay the plaintiffs the sum of $730.

2. That the defendant deliver to the plaintiffs five volumes of "In Arctic Seas" bound in levant, and three volumes of the same book of the first or second edition, or cash value thereof at the rate of $10.00 for each levant volume and $2.00 for each other volume. And further, that he deliver to the plaintiffs all prospectuses of the said book and all circulars describing the same in his possession, and all copies of the said book over and

above the four thousand one hundred and forty-three volumes delivered to him by the Historical Publishing Company prior to May 29, 1894, or the cash value of the said copies at the rate of not less than $2.00 per copy, and the defendant give to plaintiffs an order on the said Historical Publishing Company for any and all copies of the said work, prospectuses thereof and circulars describing the same, free and discharged of any and all liens the publishing company may have against the same by reason of any total or partial nonpayment therefor.

3. That the contract of September 29, 1892, between plaintiffs and defendant, a copy whereof is set forth as exhibit " A " of plaintiff's bill, is canceled, rescinded and made null and void.

4. That the defendant forthwith surrender and deliver up said contract to the plaintiffs.

5. That the defendant forthwith sign a deed of conveyance to the plaintiffs conveying, setting over and assigning to them all his right, title and interest in the copyright of " In Arctic Seas," at present copyrighted in his own name.

6. That the defendant pay the costs of this suit. That the defendant forthwith deliver to the plaintiffs all the electrotype plates and all dies and other materials pertaining to the printing and illustrating of the book " In Arctic Seas " that were turned over to defendant by plaintiffs at the beginning of the book's publication or that were subsequently purchased by defendant therefor and for which he was credited in his account with plaintiffs.

*Error assigned* was above decree, quoting it.

*William F. Johnson,* for appellant.—The fundamental error is in the two conclusions of law : (*a*) That certain parol evidence essentially affected an agreement in writing, and (*b*) that the relations of the parties were those simply of principal and agent, instead of copartners : Honesdale Glass Co. v. Storms, 125 Pa. 268.

In point of fact, the transaction was simply a partnership venture to which the plaintiffs contributed the principal portion of the matter for publication. The defendant, in consideration thereof, was to bear all expenses of publication and pay the plaintiffs out of the profits, first, 40 cents for each copy of

sheets of the old book published by them, and secondly, one fourth of the remaining profits. No stipulation was made in the partnership agreement either as to the number of books to be published or the price at which they should be sold. The nature of the business rendered it impossible.

*Marcel A. Viti,* with him *Reginald K. Shober,* for appellees.— Where an attempt is made to use a written instrument in violation of an agreement accompanying its execution, to which attempt no moral guilt can be imputed, a legal delinquency attaches to the attempted abuse of the writing, sufficient to subject it to the influence of oral evidence : Rearich v. Swinehart, 11 Pa. 233 ; Phillips v. Meily, 106 Pa. 543 ; Wodock v. Robinson, 148 Pa. 503 ; Juniata Building Assn. v. Hetzel, 103 Pa. 507 ; Walker v. France, 112 Pa. 203 ; Honesdale Glass Co. v. Storms, 125 Pa. 268 ; Sidney Sch. Furniture Co. v. Warsaw Sch. Dist., 130 Pa. 76 ; Ins. Co. v. Williams, 155 Pa. 405 ; Lippincott v. Whitman, 83 Pa. 244.

A finding of fact by a master approved by the court will not be set aside by the Supreme Court unless the error is flagrant : Ranninger's App., 118 Pa. 20 ; Bedell's App., 87 Pa. 512 ; Robbs' App., 41 Pa. 49; Donaldson's Est., 158 Pa. 292; Lewis' App., 127 Pa. 127 ; Borough's App., 6 Cent. Rep. 142; Stocker v. Hutter, 134 Pa. 22.

OPINION BY MR. JUSTICE McCOLLUM, November 11, 1896 :

The learned master found there was an oral agreement prescribing the form and quality of the book and fixing the price at which it should be sold. He said in his report that this agreement did not modify the written contract, but that it simply regulated matters as to which the latter was silent. He interpreted it however as fixing the selling price of every book published by the defendant under the written contract and as guaranteeing the sale of it at that price. He accordingly charged the defendant at least $2.00 for every book sold directly to the trade and for every book sold by agents, and at least $3.00 for every book "sold for cash and through the mail."

We think the learned master erred in his conclusion that the oral agreement was applicable to all the books the defendant

might publish and dispose of under the written contract, and that the latter was not modified by the former. It seems to us that the oral agreement materially modified the written contract and was applicable only to the first edition. The evidence fairly warranted the finding of an oral agreement applicable and limited to the first edition but it did not authorize the finding of an agreement applicable to all books the defendant might publish and sell under the written contract. We may therefore construe the agreement found by the master as limited to the first edition, and, with this modification of the written contract, determine the rights of the parties thereunder. By the terms of the contract so modified the plaintiffs were entitled to an account of the publication and sale of the first edition, on the basis adopted by the master. But the oral agreement furnished no basis for an account of the publication and sale of the second and third editions. As to these the contract as written furnished the basis for an adjustment. On the basis thus furnished the plaintiffs are entitled to receive, first, $240 from the net profits arising from the publication and sale of the work, and after that to have one fourth of the net profits realized from the handling of the work by the defendant. All the expenditures connected with the publication and sale of the book must be borne by the defendant, and after the payment of $240, as above stated, three fourths of the net profits of the enterprise belong to him. In the absence of net profits the plaintiffs are not entitled to anything more than a cancellation and surrender of the contract, together with a conveyance to them of the defendant's rights in the copyright.

The written contract did not prescribe the form, style or quality of the work or fix the selling price of it. These matters were left to the discretion of the publisher, whose interest in it would naturally impel him to use his best judgment and skill to make the venture a success. He was not required to continue the publication and sale of the book at a loss, but it was his duty to do all that he reasonably could to promote the success of the enterprise.

The amount expended in the publication of the unsold books should be deducted from their market value and one fourth of the balance, if any, should be paid to the plaintiffs. As it is evident that the defendant does not regard the copyright or

contract as of any value to him there can be no reasonable objection to the 4th and 5th paragraphs of the decree.  In fact the learned counsel for the appellant makes no objection to them.

Decree reversed at the cost of the appellees, and record remitted with direction to state an account and enter a decree in accordance with this opinion.